UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LENALLE SHANNON,

        Plaintiff,                         Case No. 04-CV-73173

vs.

                                         HONORABLE VICTORIA A. ROBERTS
                                         HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.    Background**

Lenalle Shannon brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits under Title II of the Social Security Act. Plaintiff has filed a motion for remand and defendant has filed a motion for summary judgment, both of which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's motion for remand be DENIED and Defendant's motion for summary judgment be GRANTED.

**A.    Procedural History**

This is an action by the Plaintiff, Lenalle Shannon, seeking judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB). See 42 U.S.C. §§ 416(i), 423(d).

Plaintiff applied for DIB on February 21, 2002, alleging that she had became disabled on

May 11, 2001, due to torn rotator cuffs in both shoulders, uncontrolled diabetes and hypertension. ( R. 38-40, 52). After her DIB application was denied, Plaintiff, represented by her attorney, testified along with a vocational expert at a hearing before Administrative Law Judge (ALJ) Douglas N. Jones. ( R. 266-302). On April 2, 2004, the ALJ found that Plaintiff was not disabled because she could perform a significant number of jobs in the economy. ( R.10-19). The Appeals Council denied review of this decision in a letter dated June 18, 2004. ( R. 4-6).

### B. Background Facts

#### 1. *Plaintiff's Testimony*

In Plaintiff's initial Disability Report (Report), which she completed on March 26, 2002, Plaintiff alleged to have bilateral shoulder pain, which sometimes went into her arms and which was exacerbated by pushing, pulling, lifting, dusting, sweeping, mopping and putting on her clothes. ( R. 65). Plaintiff further alleged that she tried applying heat and taking medication for the pain to no avail. ( R. 65-66).

Plaintiff reported that since her shoulder surgeries she could walk only two to three blocks and sometimes only to her mailbox, before experiencing shortness of breath and shoulder pain which required her to stop walking. ( R. 66). Plaintiff indicated that she could "maybe" lift 5-10 pounds, was limited by pain in the use of her hands and arms but was not limited in her ability to sit. ( R. 67). Plaintiff also indicated that she could cook for herself and bath herself, but could not lift heavy cooking equipment or not easily reach under her arms or her back. ( R. 67). In the Report under "Daily Activities," Plaintiff indicated that she prepared her own breakfast; performed some housework (with lots of breaks and assistance from her daughter), such as dusting, sweeping, mopping, and washing dishes; read the newspaper and sometimes magazines; watched television;

went to church; and visited with family and friends that come to visit her. ( R. 61-63). Plaintiff also indicated that she took naps on and off throughout the day. ( R. 61).

At the hearing in March 2004, Plaintiff testified that she was 5 feet 9 or 10 inches tall and weighed about 262 pounds. ( R. 271). She graduated from high school in 1971. ( R. 271).

Plaintiff was working at Dow Chemical on May 11, 2001, when she terminated her employment to have surgery on her left shoulder. She has not been employed since that time. ( R. 271). While at Dow Chemical, Plaintiff primarily worked as a materials handler which involved loading drums filled with various materials, driving forklifts and "working the warehouse." ( R. 281, 283-285).

Plaintiff injured herself on the job and initially received weekly contract disability benefits and a lump sum Worker's Compensation benefit. She currently receives disability pension benefits in the amount of $1,184 per month. ( R. 274-275).

Plaintiff testified that she was able to drive a car and does so almost every day ( R. 277). Yet, she added that she was scared to drive since having an auto accident and had problems gripping the steering wheel ( R. 292).

Plaintiff noted that she was able to take trips "up north" to visit her relatives and took a cruise to Mexico in 2003 which required that she fly to Texas. ( R. 278).

Plaintiff had problems with her shoulders prior to 2001. ( R. 285). In May 2001, she underwent an operation on her left shoulder to repair a torn rotator cuff. ( R. 285-86). She also had manipulations performed on both shoulders when they "locked up." ( R. 286). She indicated that the surgeries helped, but that her shoulders still bothered her and that she had a hard time with putting on and removing her clothing, raising her arms in the air, washing and curling her hair and

3

maintaining a grip on items. ( R. 287-88).

Plaintiff also has diabetes, hypertension and congestive heart failure. ( R. 288). She stated that due to diabetes, her feet hurt constantly and swell. ( R. 288-89). She also indicated that she was diagnosed with a hemorrhage in her left eye due to her blood sugar being too high. ( R. 289).

Plaintiff also was depressed and had been prescribed an antidepressant one month before the ALJ hearing. ( R. 289). Her daughter lived with her until January 2004. ( R. 291). Her son took care of the shoveling and lawn mowing at her house. ( R. 291).

Plaintiff claimed that she had to lie down two or three times a day for an hour or two at a time because her medication made her drowsy. ( R. 292, 294). Plaintiff joined Curves (an aerobic exercise center), but reported that she could not complete the exercise because her pulse would get to high. ( R. 293). While her doctor recommended that she try to walk for exercise, she cannot do so because she gets short of breath and comes back with pain. ( R. 296). Her doctor also gave her a diabetic diet to follow and told her to lose weight, but she cannot do this because she gets nervous and depressed about the task and, in her words "And I just–and I eat." ( R.  297).

### *2. Plaintiff's Friend's Statement*

Plaintiff's friend completed a questionnaire on March, 27, 2002, and indicated that Plaintiff was able to take a shower and groom herself; make toast; take medication; watch television; play Bingo sometimes: play cards on the computer; talk on the telephone daily; and get along well with other people. ( R. 68-71). This friend also noted that Plaintiff changed and was more isolated since her shoulder surgery and that, due to pain, she had trouble cleaning the house, doing yard work, shopping and combing her hair. ( *Id.*).

### C. Medical Evidence

According to the medical evidence, Plaintiff had a history of Type II diabetes mellitus and hypertension. ( R. 89, 193).

On January 24, 2000, Plaintiff presented to the emergency room, and received treatment for viral gastroenteritis. ( R. 89-91). Her symptoms were stabilized, and she was discharged in stable condition. ( R. 91).

On December 8, 2000, Plaintiff reported pain in her shoulders while driving a forklift truck at work. ( R. 129). Plaintiff had cortisone injections in both shoulders on December 13, 2000. ( R. 126).

On February 7, 2001, after Plaintiff complained of chest pain, Dr. Narcisco ordered a chest x-ray to rule out pneumonia. ( R. 105).

On February 16, 2001, Marcia K. Lee, D.O., indicated that Plaintiff had the following permanent restrictions: limited pushing and pulling with both arms; no lifting greater than 15 pounds; no over the shoulder work with either arm; and limited fork truck driving to no more than 60 minutes in an eight-hour shift. ( R. 121-124).

On March 30, 2001, Anthony de Bari, M.D., saw Plaintiff for her complaints of problems with both shoulders with severe pain upon motion of the shoulders. ( R. 200). He noted quite a bit of tenderness over the acromial clavicular ("AC") joint, limited motion above her shoulders, and impingements signs. ( R. 200). X-rays of both shoulders showed an arthritic change at the AC joint. ( R. 200). Dr. de Bari recommended an MRI of both shoulders as well as an excision of the distal end of the clavicle and acromioplasty of both shoulders. ( R. 200). Dr. de Bari

checked a number of boxes regarding Plaintiff's restrictions including no repetitive reaching; working only below shoulder level; no reaching, pushing, or pulling; limited reaching, pushing, pulling, of arm and shoulder; no lifting over 15 pounds. ( R. 201). He also wrote in "no driving a fork truck." ( R. 201).

An April 14, 2001, MRI was positive for acromioclavicular joint hypertrophy in the left shoulder and diffuse tendinopathy of the supraspinatus portion of the rotator cuff. ( R. 199).

On May 16, 2001, Dr. de Bari performed an excision of the distal end of the left clavicle with acromioplasty of the left shoulder, and repair of the left rotator cuff tear. ( R. 195). By June 1, 2001, Dr. de Bari reported that Plaintiff's wound had healed nicely, but she still had significant pain in the left shoulder. ( R. 184). He doubted that Plaintiff could return to work for another two to three months. ( R. 184).

On July 17, 2001, Dr. de Bari noted continued complaints of left shoulder pain, that Plaintiff could barely lift her left arm above shoulder height and that Plaintiff now complained of right shoulder pain. ( R. 182). Dr. de Bari prescribed Vioxx and recommended that Plaintiff continue with therapy and return in one month. ( R. 182).

On September 6, 2001, Dr. de Bari recommended that Plaintiff undergo manipulation and injection of the left shoulder. ( R. 179). He noted that Plaintiff's right shoulder was also symptomatic with tenderness over the AC joint, positive impingement signs, pain on range of motion, and tenderness, with a partial tear of the right rotator cuff revealed by MRI. ( R. 179). He recommended that Plaintiff undergo right shoulder surgery. (*Id.*).

On September 21, 2001, Dr. Narcisco ordered a chest x-ray, which came back negative, after Plaintiff complained of shortness of breath and difficulty breathing. ( R. 102).

On October 3, 2001, Plaintiff underwent excision of the distal end of the right clavicle, acromioplasty of the right shoulder with manipulation and injection of the left shoulder, and repair of the rotator cuff of the right shoulder. ( R. 175). Narciso Santiago, M.D, indicated in his report on that date that Plaintiff had developed an acute anxiety reaction and depression because of the chronic pain and disability in her shoulder. ( R. 172).

On October 16, 2001, Plaintiff presented to the emergency room, after having been involved in a motor vehicle accident. ( R. 93). She complained of right shoulder pain radiating to the upper chest and bilateral knee pain. ( R. 93, 99-100). Radiological studies of the chest and cervical spine were unremarkable, other than indicating possible cervical muscle spasm. ( R. 95-96). An x-ray of Plaintiff's right shoulder showed soft tissue swelling around the area and some opaque densities as well as two overlaying safety pins. This x-ray indicated that there may be some minimal cortical chip fracturing at the AC joint. ( R. 97). Pain medication was prescribed, and Plaintiff was discharged with a diagnosis of acute cervical strain. ( R. 94).

On October 23, 2001, Dr. de Bari noted that Plaintiff was feeling better since her October 3rd procedure, and he advised that she go to physical therapy to improve her range of motion. ( R. 166).

On November 27, 2001, Dr. de Bari reported that Plaintiff still had limited motion, a burning sensation, and trouble washing under her arms. ( R.165). He noted that Plaintiff had not been attending her therapy. He urged Plaintiff to do so and to follow up with him again in six weeks.

On March 26, 2002, Dr. de Bari, M.D., saw Plaintiff for her continued pain and decreased motion in both shoulders as well as numbness and tingling in her upper left extremity. ( R. 163). He ordered bilateral manipulation under anesthesia, an EMG and an nerve conduction test.

7

On April 15, 2002, Plaintiff underwent EMG nerve conduction testing. ( R. 161). Plaintiff was apparently unable to complete the testing, but the physician was able to determine that the EMG of the upper left extremity was normal and Plaintiff had "abnormal nerve conduction with multiple conduction delays suggesting peripheral neuropathy" on her right side.

On May 17, 2002, Dr. de Bari performed manipulation and injection of both shoulders under general anesthesia for the adhesive capsulitis in Plaintiff's shoulders. ( R. 159).

A state agency disability examiner reviewed the record and completed a physical residual functional capacity assessment. ( R. 256-63). The disability examiner considered that Plaintiff had undergone left and right shoulder repairs, had a diagnosis of hypertension and diabetes, was involved in an accident in October 2001, had decreased bilateral shoulder motion, and had undergone manipulations and injections secondary to adhesive capsulitis. ( R. 257). The disability examiner opined that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently; stand and or walk and sit for about six hours in an eight-hour workday; and had limited reaching (it was specified that Plaintiff could reach only occasionally and never overhead). ( R. 257-259). He found Plaintiff's physical limitations to be attributable to a medically determinable impairment. ( R. 261).

On June 13, 2002, Hans Evers, M.D. a state agency medical consultant agreed with the restrictions found by the disability examiner. ( R. 264). He specified that Plaintiff's overhead reaching was restricted, but that she could reach in other directions. ( R. 264).

### 4.    Vocational Evidence

Ann Tremblay, a vocational expert (VE), appeared and testified at the hearing. ( R. 298). She

testified that her testimony was consistent with the information contained in the Dictionary of Occupational Titles (DOT). (*Id.*).

The ALJ asked the VE to consider a hypothetical individual who was limited to light work, as that is defined in DOT, but who could lift no more than ten pounds and who could only occasionally engage in forward reaching with the arms, never reach over shoulder level nor engage in forceful or sustained gripping and grasping with either hand. (R. 299).

VE Trembley found this hypothetical worker would be unable to perform Plaintiff's past work. (R. 299). And, in fact, the lifting restrictions alone would preclude performance of Plaintiff's past work. (R. 299). Yet, the VE found that the hypothetical worker could perform a number of light unskilled which were available in the Lower Peninsula State of Michigan: inspector (7,000), messenger (3,800) and/or hostess (4,600). (R. 300).

The ALJ then asked the VE to assume that the hypothetical restrictions remained the same except that the lifting restriction was only lift five pounds. (*Id.*). VE Trembley answered that this would reduce the available inspection jobs to 3,500, but would otherwise not effect the data she provided. (*Id.*).

The ALJ then asked the VE to assume that the hypothetical person were restricted to sedentary work with the above-mentioned restrictions. (*Id.*). VE Trembley found that the hypothetical worker could perform a number of sedentary jobs which were available in the Lower Peninsula State of Michigan in the quantities indicated: security monitor (2,100), order clerk (5,500) and sorter (1,500). (*Id.*). When asked, the VE explained that lowering the weight capacity to five pounds would have no effect for these sedentary jobs. (*Id.*).

Plaintiff's counsel asked whether an individual would be precluded from the either the light

or sedentary jobs if they were required to lie down for one hour twice during any eight hour period. VE Trembley acknowledged that an individual would be precluded from all of the jobs under that scenario. ( R. 301).

### 5. The ALJ's Decision

ALJ Jones determined that Plaintiff met the requirements set forth in the Social Security Act and was insured through April 2, 2004, ( R. 18) and that Plaintiff had not engaged in substantial gainful activity since May 11, 2001 ( R. 14). ALJ Jones found that Plaintiff had the following impairments: bilateral degenerative joint disease (shoulders), status bilateral post joint manipulation (shoulders), diabetes with mild right eye retinopathy, hypertension, status post hysterectomy, exogenous obesity, anxiety and depression. ( R. 15-16). ALJ Jones found that Plaintiff's combination of impairments was considered severe as defined by 20 C.F.R 404.1520(b), but found that none of Plaintiff's impairments met or equalled a listed impairment in Appendix 1, Subpart P, Part 404 of the Regulations. ( R. 16, 18).

He did not consider Plaintiff's allegations concerning her limitations credible because he found them to be "inconsistent with the objective medical evidence, the lack of more aggressive medical treatment, the claimant's ordinary activities including frequent driving and caring for her grandson and the claimant's failure to adhere to her prescribed diabetic/weight loss diet." ( R. 17).

ALJ Jones found Plaintiff to have a Residual Functional Capacity (RFC) to: perform light work involving lifting no more than five pounds, occasional (up to 66%) forward reaching, no overhead reaching and no forceful or sustained gripping or grasping. ( R. 16).

Based on this RFC and the VE's advice, ALJ Jones found Plaintiff unable to perform her past work. ( R. 19). ALJ Jones also determined that Plaintiff had no transferrable skills from her past

employment. (*Id*.).

Yet, using the Medical-Vocational Rules as a framework for decisionmaking and considering the VE's testimony regarding the number of jobs available, ALJ Jones found that there were a significant number of jobs in the national economy that Plaintiff could perform and she was, therefore, not disabled. ( R. 19).

**II.     Analysis**

    **A.     Standards of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v*. *Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[1]  A response to a flawed hypothetical question is not

---

[1] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987)

substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.    Factual Analysis**

Plaintiff raises two challenges to the Commissioner's decision: (1) the ALJ erred in not properly considering Plaintiff's obesity in determining her RFC; (2) the ALJ failed to properly incorporate anxiety and depression into Plaintiff's RFC and the hypothetical to the VE.

*1.    Obesity Considerations*

The Regulations provide for a determination that a claimant is not disabled on the threshold ground that the individual does not have a severe impairment; an impairment that places a significant limit on the individual's physical or mental ability to do basic work activities. S.S.R. 85-28; *Bowen v. Yuckert*, 482 U.S. 137 (1987). This is the second step of the disability determination. In his decision the ALJ found Plaintiff to have a combination of impairments that, when considered collectively, met this threshold. ( R.18). The ALJ was then required to proceed to the third step in the disability analysis, which he did. Therefore, to the extent that Plaintiff is arguing that the ALJ committed reversible err by merely failing to label her specific impairments "severe" at step two, Plaintiff's argument is without legal merit. *Maziarz v. Secretary of Health & Human Services*, 837 F.2d 240, 244 (6th Cir., 1987); 20 C.F.R. 404.1545(2).

Further, contrary to Plaintiff's allegation, the ALJ did not refer to Plaintiff's obesity as a severe impairment and then later recant. The ALJ merely included obesity as one of the impairments

---

(Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

that he took collectively to meet the threshold severity requirement at the second step of the disability analysis. ( R. 15-16). The ALJ went on to explain that Plaintiff's obesity, when considered alone, was not a severe impairment but was taken into account as a complicating factor in Plaintiff's "diabetes and other documented impairments, and accentuate[d] to some degree the limitations they cause...." ( R. 16). The ALJ also acknowledged that Plaintiff's obesity was incorporated into her RFC pursuant to Social Security Ruling 02-1p. ( R. 17). Therefore, Plaintiff's allegation that "there is no discussion in the ALJ's decision as to the Commissioner's requirement to at least consider a combined effect" of hypertension, diabetes and obesity on Plaintiff's "capacity to perform work" (Plaintiff's Brief, p. 4) is simply without merit.

Plaintiff further argues that the ALJ "failed to consider the combined effects of the 'severe' impairments with that of a listed impairment at Step 3...." ( Plaintiff's Brief, p. 5). Yet this argument is also without merit because the ALJ clearly recognized and fulfilled this requirement when he referred to Plaintiff's "combination of impairments" ( R. 18) as "collectively 'severe'" ( R. 16) but insufficient to meet the Listing ( R. 16, 18). *Gooch v. Secretary of H.H.S.*, 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings.").

Plaintiff labeled her arguments regarding her obesity "an issue of *articulation*" and asked this Court to remand to ask the ALJ to consider obesity's effect on her other impairments. Because the ALJ considered the vocationally significant effects of Plaintiff's impairments in determining her residual functional capacity, Plaintiff's motion should be dismissed.

### *2.     Anxiety and Depression*

Plaintiff argues that the ALJ failed to evaluate properly her ability to perform work after the ALJ found her anxiety and depression to be "'severe' at Step Two of the evaluation process." ( Plaintiff's Brief, p. 7). Yet the ALJ did not actually find Plaintiff's mental impairments to be severe. ( R. 16). The ALJ included Plaintiff's anxiety and depression in the list of impairments which collectively met the threshold of severity for step two of the disability analysis ( R. 15-16), but explained that none of the impairments met or equaled any of the criteria in the Listing and specifically stated that Plaintiff's mental impairments led to only mild restrictions in her daily life, social function, concentration, persistence and pace and, therefore, did not significantly affect her ability to perform the mental demands of basic work activities and did not constitute a severe impairment. ( R. 16).

In her Reply brief Plaintiff concedes this point but states that even if the ALJ did not find Plaintiff's depression and anxiety to be severe, the "mental restrictions" these impairments caused Plaintiff were not properly included in the RFC determination or the hypothetical posed to the VE. ( Plaintiff's Reply Brief, p. 3).

It is true that after it was determined that Plaintiff could no longer perform her past work, the burden was on the ALJ to identify jobs in the national economy that can accommodate the Plaintiff's RFC. *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 474 (6th Cir., 2003). Yet the Sixth Circuit "has held repeatedly that the testimony of a vocational expert identifying specific jobs available in the regional economy that an individual with the claimant's limitation could perform can constitute substantial evidence supporting an ALJ's finding at step 5 that the claimant can perform other work." *Wilson v. Comm' r Soc. Sec.*, 378 F.3d 541, 549 (6th Cir., 2004); *Wright v. Massanari*, 321 F.3d 611,

616 (6th Cir., 2003); *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 481 (6th Cir., 1988); *Varley*, *supra*, 820 F.2d at 779.

Plaintiff correctly points out that reliance on vocational expert testimony hinges on the ALJ posing a proper hypothetical question to the expert, i.e. a hypothetical that accurately portrays the claimant's impairments. *Varley, supra*, 820 F.2d at 779. The ALJ is bound by the record and the hypothetical must "be an accurate summation of the evidence already presented in the record and can neither add to nor detract from that evidence." *Myers*, *supra*, 514 F.2d at 294.

In the present matter the Plaintiff did not provide any evidence of any restrictions or limitations regarding her alleged mental impairments in her Disability Report ( R. 51-67) and the only testimony Plaintiff provided with respect to her metal impairments at the hearing in this matter were two statements in which she remarked that she (a) had started taking Xanax one month before the hearing because "I don't–can hardly do too much" ( R. 289) and (b) gets "nerved up"and "depressed" when she fails to comply with her prescribed diabetic diet ( R. 297). The only other evidence that a mental impairment even exists is Dr. Narsisco's note in his October 3, 2001, consultation report indicating that Plaintiff's medical history was positive for anxiety and depression brought on by chronic pain. As stated above, this Court must determine whether the ALJ's decision is supported by "[m]ore than

a mere scintilla" of evidence (*Richardson*, *supra*, 402 U.S. at 401), because the ALJ's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion (*Mullen*, *supra*, 800 F.2d at 545). The psychological evidence in this case is thin and a reasonable fact-finder could determine it had no vocationally significant import on unskilled jobs.

The record indicates that Plaintiff maintained her personal care without reminding, drove a

car, cared for her grandchild, watched television, talked on the telephone, ran errands, maintained relationships with friends and family, played bingo, attended church and read magazines and newspapers. In fact, the only evidence provided to the ALJ regarding limitations in Plaintiff's daily activities involved her shoulder pain and physical limitations and not mental impairments. Therefore, the ALJ's decision that Plaintiff's ability to work was not substantially limited by metal impairments was supported by substantial evidence in the record and is not subject to reversal.

### III.    Recommendation

For the reasons stated above, It is Recommended that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Remand be DENIED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: June 27, 2005                                              s/Steven D. Pepe
Ann Arbor, Michigan                                           United States Magistrate Judge


Certificate of Service

I hereby certify that on June 27, 2005, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Lewis Seward and Janet Parker</u>.

                                                                        s/William J. Barkholz
                                                                        Courtroom Deputy Clerk